

**FILED**

Aug 11 2015, 5:29 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Bryan L. Ciyou
Lori B. Schmeltzer
Jessica K. Keyes
Ciyou & Dixon, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Andrea L. Ciobanu
Alex Beeman
Ciobanu Law, P.C.
Indianapolis, Indiana

## I N  T H E
# COURT OF APPEALS OF INDIANA

In re the Marriage of:

Christopher Neal Maddux,

*Appellant-Respondent,*

v.

Suzanne Marie Maddux,

*Appellee-Petitioner*

August 11, 2015

Court of Appeals Case No.
49A02-1409-DR-618

Appeal from the Marion Superior
Court

The Honorable David J. Dreyer,
Judge
The Honorable Hugh Patrick
Murphy, Magistrate

Case No. 49D10-0406-DR-1112

**Crone, Judge.**

# Case Summary

[1] Christopher Neal Maddux ("Father") appeals an order denying his motion for

modification of primary physical custody of his two sons. He claims that the

trial court's findings of fact do not support the judgment with respect to the best

interests of the children.[1]  We reverse and remand for proceedings consistent with this opinion.

## Facts and Procedural History

In March 2005, the trial court issued a decree dissolving the marriage of Father and Suzanne Marie Maddux ("Mother").  As part of the decree, the court granted joint legal custody, awarded Mother primary physical custody of the couple's children, G.M. and C.M. (collectively "the Children"), then ages three and one, and granted Father parenting time according to the Indiana Parenting Time Guidelines.

Father subsequently remarried and lives with his wife ("Wife"), their three children, and Wife's child from a previous relationship.  As of 2006, Mother and the Children moved in with Mother's parents ("Maternal Grandmother and Maternal Grandfather").   Maternal Grandfather has a felony child molesting conviction from thirty years ago.  Mother's and Father's residences are approximately two miles apart.

In 2011, Mother alleged that Father was physically abusing C.M., and she filed a petition for a protective order.  Her petition was granted, and the Department of Child Services ("DCS") began proceedings to determine whether C.M. was a

---

[1] Father also asserts that the trial court erred in recalculating his weekly child support obligation at $175, alleging that the child support obligation worksheets submitted by the parties show the correct figure to be $157.  We note that Mother concedes the issue.  *See* Appellee's Br. at 16 ("Father's child support obligation should be $157.00 per week as requested by Father in his brief on appeal.").  Thus, we remand with instructions to credit Father for any sums to which he may be entitled.

child in need of services ("CHINS"). The abuse allegations against Father were unsubstantiated, and Father filed a petition for custody modification in the CHINS court. The CHINS court appointed Dr. Richard Lawlor to perform a custody evaluation. Mother and Father submitted to the evaluation, and Dr. Lawlor recommended that Father be given custody based on Mother's pattern of undermining his relationship with the Children by demeaning him to the Children, interfering with his parenting time, and failing to inform him of important matters pertaining to legal custody. The CHINS court held a hearing in March 2012. In June 2012, the CHINS court issued special findings and a judgment dismissing the protective order and denying Father's request for custody modification. By this time, Father had not had his parenting time with the Children for approximately a year. As part of the order, Father was to undergo two weeks of supervised parenting time and resume normal unsupervised time thereafter.

[5] Mother did not bring the Children to the first unsupervised parenting time exchange at the beginning of July 2012 and allowed Father only a few days of parenting time instead of half the summer as required by court order. On July 15, 2012, Mother accused Father of abusing C.M. by smacking him on the face. She called the police, but no criminal charges were filed. The next day, DCS received a report of the alleged abuse, but found it to be unsubstantiated.

[6] On September 1, 2012, Father had parenting time with the Children at his home. During that time, an auto accident occurred in front of Father's home, and he and Wife went outside to assist the victims and talk with police. Father

and Wife could see the Children playing inside the house. C.M. began texting Mother, who became concerned that C.M. was being hurt, presumably by Father. She called the police, and the investigating officer was the same officer who had been present with Father at the accident scene. The officer found that Father could not have harmed C.M. and that C.M. showed no signs of injury.[2] The alleged abuse was unsubstantiated.

[7] During his parenting time on September 16, 2012, Father took the Children and three others to the park. C.M. later told Maternal Grandmother that Father had wrapped his head in bubble wrap and struck him in the stomach and nose. Two days after the alleged incident, C.M. had a regularly scheduled appointment with his otolaryngologist for nasal cauterization. The doctor found no evidence of an injury, and neither Mother nor C.M. mentioned it to him. Maternal Grandmother contacted DCS. Although DCS initially substantiated the incident, it was later found to be unsubstantiated.

[8] Mother denied Father any parenting time after September 16, 2012. On September 28, 2012, she sought and was granted a protective order against Father stemming from her bubble wrap allegation. In October, the Indianapolis Metropolitan Police Department sent a detective specializing in child abuse cases to investigate the allegations. Meanwhile, in November 2012, Father filed a verified petition for contempt against Mother based on her denial of his court-

---

[2] The guardian ad litem later reviewed the transcript of the text messages and found that they were vague and did not implicate Father.

ordered parenting time and her failure to notify him of the Children's medical appointments. He also filed a verified motion to enforce parenting time. In December 2012, the detective notified Mother that criminal charges would not be filed due to a lack of evidence. In February 2013, Mother filed a verified petition for modification of parenting time, claiming that a criminal investigation was pending regarding her allegations that Father had abused C.M. with bubble wrap. The bubble wrap allegation was never substantiated.

[9] On September 24, 2013, Father filed a verified petition for modification of physical and legal custody. He also sought a permanent injunction prohibiting Mother from interfering with parenting time and filed a motion to appoint a guardian ad litem ("GAL"). GAL Denise Hayden interviewed the Children as well as Mother and Father. She found many of C.M.'s responses to her questions about Father to be strange and possibly coached and found him to be immature. She found that C.M. might be demonstrating his love and support for Mother "by going along with whatever she says and by endorsing her no matter what." Appellant's App. at 246. GAL Hayden also reported that she did not believe that Father was abusive to the Children and that she "[did] not believe that mother [would] willingly allow the children to have a healthy relationship with their father." *Id.* In January 2014, she filed her GAL report recommending that Father be granted custody and that Mother have supervised visitation pending a psychological evaluation.

[10] On March 14, 2014, Father sought an emergency custody hearing and emergency order of custody modification. At the emergency hearing, the trial

court dismissed the protective order against Father and denied his emergency petition for custody modification. The trial court held all other motions for consideration during a hearing eventually conducted in May 2014.

[11] On August 12, 2014, the trial court entered findings of fact and conclusions thereon in an order holding Mother in contempt for denying Father's parenting time, denying Father's petition for custody modification, adjusting Father's weekly child support obligation upwards to $175, and directing Mother to pay $20,000 of Father's attorney fees.

[12] Mother filed a motion to reconsider the contempt finding and the order of attorney fees, which the trial court denied. Father now appeals the trial court's denial of his petition for custody modification and recalculation of child support. Additional facts will be provided as necessary.

# Discussion and Decision

[13] Where, as here, on request of the parties, the trial court issues findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A), we apply a two-tiered standard of review.[3] *Mysliwy v. Mysliwy*, 953 N.E.2d 1072, 1076-77 (Ind. Ct. App. 2011), *trans. denied.* First, we determine whether the evidence supports the findings, and second whether the findings support the judgment. *Id.* at

---

[3] The parties dispute the applicable standard of review. Here, Father's counsel requested special findings pursuant to Indiana Trial Rule 52(A). Appellant's App. at 109.

1077. We will reverse only if there is no evidence supporting the findings or the findings fail to support the judgment. *Id.*[4] We review the findings of fact using a clearly erroneous standard. *Id.* Clear error occurs when our review of the evidence most favorable to the judgment leaves us firmly convinced that a mistake has been made. *Id.* We review the conclusions of law using a de novo standard. *Id.*

[14] Father contends that the trial court's findings of fact do not support its judgment denying his petition to modify custody. The party seeking a modification of custody bears the burden of demonstrating that the existing custody order should be altered. *Arms v. Arms*, 803 N.E.2d 1201, 1208 (Ind. Ct. App. 2004). The trial court "may not modify a child custody order unless: (1) the modification is in the best interests of the child; and (2) there is a substantial change in one (1) or more of the factors that the court may consider under [Indiana Code Section 31-17-2-8] …" Ind. Code § 31-17-2-21(a). "In making its determination, the court shall consider the factors listed under section 8 of

---

[4] We note that several of the trial court's findings are not proper findings. Instead, they are merely recitations of testimony. For example, several findings contain phrases such as, "Father testified," "Petitioner's mother … testified," and "Ms. Chavkin testified." Appellant's App. at 26-27, 29. Findings that indicate that the testimony or evidence was this or that are not findings of fact. *Parks v. Delaware Cnty. Dep't of Child Servs.*, 862 N.E.2d 1275, 1279 (Ind. Ct. App. 2007). Rather, a "finding of fact must indicate, not what someone *said* is true, but what is determined to be true, for that is the trier of fact's duty." *Id.* (emphasis added) (citation omitted). In other words, the "trier of fact must adopt the testimony of the witness before the 'finding' may be considered a finding of fact." *Id.* (citation omitted).

this chapter." Ind. Code § 31-17-2-21(b).  Indiana Code Section 31-17-2-8 states in pertinent part,

> The court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there is no presumption favoring either parent. The court shall consider all relevant factors, including the following:
>
> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
> > (A) the child's parent or parents;
> >
> > (B) the child's sibling; and
> >
> > (C) any other person who may significantly affect the child's best interests.
>
> (5) The child's adjustment to the child's:
>
> > (A) home;
> >
> > (B) school; and
> >
> > (C) community.
>
> (6) The mental and physical health of all individuals involved.
>
> (7) Evidence of a pattern of domestic or family violence by either parent.

[15]   Here, the trial court's extensive findings of fact include the following:[5]

---

[5]  The trial court's findings refer to Mother as "Petitioner" and "Mother" interchangeably and to Father as "Father" and "Mr. Maddux" interchangeably.  For the sake of consistency and clarity, we use "Mother" and "Father" throughout.

9. Dr. Richard Lawlor performed a custody evaluation and testified at the March 8, 2012 hearing.

10. Therein, Dr. Lawlor recommended custody be modified to Father due to Mother's "pattern of undermining of [Father's] relationship with the boys" ….

11. Special Findings were issued on or about June 7, 2012, dismissing [Mother's] Order of Protection and denying Father's request for modification of custody.

….

17. There are several cases on point that are illustrative regarding the course of the present case.

-*Arms v. Arms*, 803 N.E.2d 1201 (Ind. Ct. App. 2004): Father was granted sole physical custody and Mother's parenting time was restricted to every-other-Sunday, non-overnight visitation after Mother made false allegations of abuse that were unsubstantiated against Father and his then-girlfriend. Mother spoke negatively about Father and his girlfriend to the children, and denied Father his entire weekend parenting time. The child began seeing a therapist, who determined the child was being emotionally harmed, and the child was being coached as to false statements regarding abuse. The child's therapist noted that the child was worried about upsetting his Mother. The Court allowed evidence from a previous hearing showing a pattern of behavior by Mother. The Court held, "past behavior is a valid predictor for future conduct." *Id*. at 1210.

-*Albright v. Bogue*, 736 N.E.2d 782 (Ind. Ct. App. 2000): Mother made allegations of sexual abuse against Father to the child's doctor. The abuse allegations were unfounded. Mother also alleged that the child's Paternal Grandmother had sexually abused the minor child. The allegations were unsubstantiated by DCOFC (Delaware County Office of Family and Children). Testimony was given that Mother was putting up barriers to visitation because she did not want Father to have the child for any reason. The child was exhibiting "anxiety, depression, and aggressive behavior, and that he had verbalized a wish to be dead." *Id*. at 786. Testimony was given about a pattern of

Mother's complaints, and that Mother was in need of individual psychotherapy. The Court held: "… the real issue in this case is not whether [Mother] is being penalized in some fashion for her reporting of alleged child molestation to the authorities, [sic] Rather is it clear that the trial court's decision to modify custody was based upon ample evidence to support the conclusion that [Mother] was causing harm to [the child] by placing pressure on him to say that he was being molested and by attempting to interfere with [Father's] parenting time.["] *Id*. at 789, emphasis added. Father was granted custody after the Court held that the substantial change in circumstances leading to modification of custody to Father was misconduct that placed the child's mental and physical welfare at stake. *Id*. at 790.

-*Hanson v. Spolnik*, 685 N.E.2d 71 (Ind. Ct. App. 1997): Mother made allegations of sexual abuse by Father to a therapist that Father never met with. CPS did not substantiate allegations. Mother called Father names in front of the child, including "Satan." Father argued that Mother was engaging in a pattern of parental alienation affecting the child's emotional and psychological needs. The Court found that Mother had worked to destroy the relationship between the child and Father since the divorce. Father was granted sole custody of the minor child, and was awarded $62,500 in attorney fees, to be paid by Mother.

18. Almost immediately after the last Order of the Court was issued in the 2012 modification hearing in July, 2012, Mother began to deny Father parenting time without justification or Court Order.

19. On or about July 1, 2012, when Father's parenting time was to resume, after Father successfully completed a short period of supervised visitation due to the extended period he had been denied parenting time with his sons, Mother denied him time, and told police officers that Father was not to have parenting time until a new Court trial was held.

….

22. Mother allowed Father some parenting time in July and August, 2012, but not his half of the summer as he was granted per the Court's Order.

23. Mother took the Children out of state to St. Louis, Missouri, without informing Father, and during his summer parenting time in 2012.

24. The first allegation of abuse was made against Father on or about July 15, 2012, just over one (1) month after the Order from the 2012 modification trial.

25. Mother contacted the police and Department of Child Services (herein "DCS") on or about July 15, 2012, claiming that Father hit C.M. in the face.

26. The abuse was unsubstantiated by DCS, and no charges were filed against Father.

….

30. There is no credible evidence to corroborate allegations of abuse on or about July 15, 2012. That the Court finds that the parties communicated by phone on or about July 28, 2012, where Mother notes that C.M. has a lying problem, and she can get DCS to stop if she wants ….

31. Mother proposed a "pact" on or about July 28, 2012 that she would discuss any allegations of abuse with Father.

32. On or about September 1, 2012, Mother called the police alleging that Father had injured C.M. during his parenting time.

33. A police officer that responded to the call and allegation had been outside with Father for an extended period, as a[n] automobile accident had occurred just in front of Father's house.

34. The police officer did not make a report about the allegations. Father was not criminally charged, and the officer spoke with C.M. regarding the incident.

35. There is no evidence to support allegations of abuse on or about September 1, 2012.

36. Mother alleged, in her petition for Order of Protection filed on or about September 26, 2012 that Father injured C.M. by wrapping his face with bubble wrap after a nosebleed, purported to have happened on or about September 16, 2012.

37. Photographic and testimonial evidence do not show any injury to the face, head or neck of the child.

….

39. This matter was not reported to police until approximately one week later.

40. The Petition for Order of Protection was not filed until approximately a week and a half later.

41. C.M. had an appointment [with otolaryngologist Thomas Fairchild] for nasal cauterization on September 18, 2012, which was scheduled in August, 2012 due to chronic nasal issues.

42. Dr. Thomas Fairchild … noted that C.M. has a history of issues with nosebleeds and prior cauterizations of his nose.

43. Dr. Fairchild testified that he did not observe any trauma or injuries to C.M. that would raise suspicions of abuse during a scheduled appointment on September 18, 2012.

44. Mother told DCS and the pediatrician, whom she took C.M. to see after the nasal cauterization, that the cauterization was due to C.M. being hit by Father, not a previously scheduled appointment due to chronic nasal issues.

45. Neither Mother nor C.M. noted any abuse allegations to Dr. Fairchild or his staff on the morning of September 18, 2012, but did make allegations to the pediatrician that same afternoon.

46. DCS did initially substantiate the allegations against Father related to the bubble wrap contention, thereafter, upon Father filing for an administrative appeal, the findings of abuse were unsubstantiated, without the need for a hearing.

....

48.  Despite having communicated extensively with Detective Chappell and knowing that criminal charges were not forthcoming, Mother filed her Verified Motion for Modification of Parenting Time, in which she alleged that the matter was being referred to the local prosecutor for possible criminal charges.

....

50.  Maternal Grandfather … transports the Children to doctor and therapy appointments on a regular basis, rather than Mother.

51.  Maternal Grandfather also has a criminal history involving sexual abuse against a family member, and served jail time for same.

....

53.  Until recently, after March, 2014, the minor Children were sleeping in the same room, and often the same bed as Mother, with no privacy screen or divider.

54.  Until December, 2012, Mother denied Father parenting time with either G.M. or C.M., despite the fact that the Order of Protection did not cover G.M. and there were no allegations of abuse or neglect relating to G.M. at any time.

....

56.  Mother's denial of Father's parenting time has been a consistent cycle since 2008, and Mother has been denying Father parenting time by making reckless allegations of abuse and neglect consistently since 2011.

....

61.  Mother's failure to pay her student loans has negatively affected Father's credit.

62.  That the Court finds that Father has incurred substantial legal fees

to defend against the above-pending matters, in the amount of approximately $49,000.00 ....

....

64. [GAL] Hayden was concerned that Mother had consented to C.M. being subjected to corporal punishment at school after C.M. was found to be stealing and lying. Also, that Mother portrays Father to the minor Children as a "cheater" and the Children's belief that the divorce was "daddy's fault." GAL Hayden also noted the pattern of false allegations by Mother that begin almost immediately after the resolution of CPS complaints and Father's parenting time resuming. GAL Hayden further was concerned about the evidence of Mother's resistance to Father's relationship with the Children over a period of three (3) years.

65. [GAL] Hayden was also concerned about G.M.'s disclosure to her that he had been suicidal due to people telling him to shut up. Mother did not seek counseling for G.M. for his suicidal thoughts.

66. The GAL noted in both her report and through her testimony that she did not believe that Father is abusive to the Children.

67. [GAL] Hayden notes the wishes of the children to remain living with their Mother, based on fear and anxiety of the lack of recent positive relationship with Father, and of unfamiliarity with that unknown generally.

68. [GAL] Hayden further notes the positive emotional development of the two children in their current situation.

69. [GAL] Hayden recommended that Father be granted primary physical custody of the minor Children and sole legal custody. Additionally, that Father should be the parent exclusively authorized to seek medical treatment for the Children.

70. GAL Hayden recommended that Mother only have supervised parenting time or contact by telephone or mail until she completes a psychological evaluation by a Ph.D. psychologist in her report filed on or about January, 2014.

Appellant's App. at 20, 22-29.[6]

[16]    The trial court's conclusions of law state in pertinent part,

> 75. Mother's continual actions of false allegations, denying Father parenting time, and leaving the Children unsupervised with Maternal Grandfather is irreparably harming to the Children's relationship with Father and their emotional wellbeing, and for it the court finds Mother in contempt.
>
> 76. Father has proved there is a substantial and continuing change in circumstances, but has not proved change of custody is in the best interests of the children. The parties shall be joint legal custodians of the two children.
>
> 77. Parenting time shall follow a graduated path reuniting Father with the children. The parties have picked a counselor/provider to assist with this function. This shall as soon as practicable be set on a course of unsupervised parenting time. The child support order is calculated on 91-95 overnights per year, and this will obviously include split holiday and summer seasons.
>
> 78. The court will not summarily substitute its judgment over the considered and professional opinion of such provider, but this order is intended to make clear that reunification of children and Father is the paramount concern.
>
> ….
>
> 85. Father has failed to prove both prongs of the test for change of custody, specifically, that there is a substantial change in circumstances, but that this does not warrant a change in custody because of both the need for a therapeutic period of reunification, and because the children are developing well according to their ages and maturity.

---

[6] We note that several pages in the appellant's appendix are out of order.

86. Mother has willfully[]denied Father parenting time by making reckless and sometimes baseless allegations, in contempt of the Court's Order, and attorney fees are awarded against Mother in the amount of $20,000.00, payable to counsel for Father in 90 days.

87. Mother has willfully failed to pay her student loans or refinance same so that Father's credit is not affected, in violation of the Court's Orders.

*Id*. at 30-31.

[17] In support of his modification petition, Father claims that Mother's egregious and ongoing pattern of disregarding his visitation rights and filing unsubstantiated allegations of abuse has been detrimental to his relationship with the Children and to their emotional health. *See* Ind. Code § 31-17-2-8(a)(6) (in determining best interests, the trial court shall consider all relevant factors, including "the mental and physical health of all individuals involved."). A custodial parent's general lack of cooperation or isolated acts of misconduct cannot serve as a basis for custody modification. *Hanson v. Spolnik*, 685 N.E.2d 71, 78 (Ind. Ct. App. 1997), *trans. denied*. However, "[i]f one parent can demonstrate that the other has committed misconduct so egregious that it places a child's mental and physical welfare at stake, the trial court may modify the custody order." *Id*.; *Albright v. Bogue*, 736 N.E.2d 782, 790 (Ind. Ct. App. 2000).

[18] With respect to the cases cited by Father and by the trial court in its order, we recognize that those cases involved this Court's affirmances of trial court orders granting custody modification petitions based on the custodial parent's pattern

of egregious conduct jeopardizing the emotional and physical wellbeing of the child. *Arms*, 803 N.E.2d at 1210; *Albright*, 736 N.E.2d at 789; *Hanson*, 685 N.E.2d at 78-79. In contrast, here we are asked to reverse a trial court judgment denying a custody modification petition where the evidence and findings indicate a pervasive pattern of egregious behavior by the custodial parent adversely affecting the children's wellbeing. Although we are hesitant to tread upon the trial court's unique position as finder of both fact and law, we note that our decision is based on the conclusions of law, which we review de novo.

[19] We recognize that "the fact-finder is not required to accept the opinions of experts regarding custody," *Clark v. Madden*, 725 N.E.2d 100, 109 (Ind. Ct. App. 2000), but the findings here indicate that the trial court did accept the GAL's conclusions and applied them to other determinations such as its contempt citation against Mother. In fact, in Conclusion 75, the trial court characterizes Mother's conduct as causing irreparable harm not only to the Children's relationship with Father but also to "their emotional wellbeing." Appellant's App. at 30. Yet, with respect to the Children's best interests, the trial court states in Conclusion 85, "the Children are developing well according to their ages and maturity." *Id*. at 31. These conclusions are inconsistent, and the findings do not support the court's conclusion regarding best interests. For example, the findings include references to G.M.'s suicidal thoughts and Mother's lack of response to them as well as information about C.M.'s problems with lying and stealing.

[20] The trial court's conclusions characterize Mother's contumacious conduct as "continual" and the change in circumstances as "substantial and continuing." *Id.* at 30-31. Mother evidently did not learn from the 2012 proceedings but instead persisted not only in denying Father his parenting time but also in falsely accusing him of abuse. The evidence in these proceedings is similar in nature to that of the 2012 proceedings, and in the intervening years, the Children have been further deprived of Father's parenting time and are more fearful of him due to the protracted lack of contact and Mother's doubling down on her unsubstantiated accusations against him. In other words, Mother has created the problem from which she now benefits.

[21] After entering finding after finding illustrating Mother's audacious and successful attempts to alienate Father from the Children, the trial court concluded that such conduct "does not warrant a change of custody." *Id.* at 31. At the same time, the court emphasized that "this order is intended to make clear that reunification of children and Father is the paramount concern." *Id.* at 30. While we appreciate the trial court's sensitivity to "the need for a therapeutic period of reunification" between Father and the Children, *id.* at 31, we fail to see why the therapeutic approach cannot be coupled with the change in custody to Father. Mother has shown a pervasive and consistent disregard for legal processes and court orders and, having once again averted a change in physical custody, there is little incentive for her to suddenly comply with the

court's order concerning the Children's measured reunification with Father.[7] Even if she does, there is no reason to believe that she would do anything other than undermine it.

[22] Simply put, time is running out. These children, ages one and three at the time of the divorce, are now eleven and thirteen. They not only have been deprived of their relationship with Father but also have been relentlessly subjected to Mother's jaded opinions of him and her egregious and unsubstantiated accusations against him. The overwhelming evidence and extensive findings of fact show a mother who has jeopardized her children's emotional health in attempting to settle a score with their father. In ruling on Father's petition for contempt, the trial court concluded that Mother had "irreparably harmed [the Children's] emotional wellbeing." Appellant's App. at 30. However, in assessing the Children's best interests, the court inexplicably concluded the opposite. The findings support the trial court's conclusion of Mother's irreparable harm to the Children; they do not support the trial court's determination concerning best interests. The trial court clearly erred in concluding that the Children's best interests do not warrant a change in custody. Consequently, we reverse the denial of Father's petition for custody modification and remand for entry of judgment in his favor on this issue and a new calculation of the parties' child support obligations.

---

[7] We sincerely hope that Mother has complied and that sufficient time has elapsed to have afforded the Children the opportunity to become reacclimated to spending time with Father.

Reversed and remanded.

Brown, J., and Pyle, J., concur.